IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JAMES BAILEY,

      Petitioner,

vs.                                 Case No. 5:09cv221/RS/EMT

KENNETH S. TUCKER,[1]

      Respondent.

_____/

## ORDER and REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 9).  Petitioner filed a reply (doc. 16).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed by the parties and established by the state court record (*see* doc. 9; doc. 16 at 1).[2]  Petitioner was charged in the Circuit Court in and for Calhoun County, Florida, Case Nos. 05-0143 and 05-0144, with one count

---

[1] Kenneth S. Tucker succeeded Edwin G. Buss, who succeeded Walter A. McNeil, as Secretary for the Department of Corrections.  Secretary Tucker is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 9).

of burglary of a dwelling with an assault or battery (Count I), one count of aggravated battery (Count II), and one count of battery on a person 65 years of age or older (Ex. B at 10). Following a jury trial on February 16, 2006, he was found guilty as charged (Ex. B at 157; Exs. E, F). He was sentenced on March 1, 2006, to twenty-five (25) years of imprisonment on Count I, fifteen (15) years of imprisonment on Count II, and five (5) years of imprisonment on Count III, to run concurrently with each other and with presentence credit of 240 days (Ex. B at 161–69, Ex. G).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D06-1364 (Ex. B at 73). Petitioner's counsel filed a brief, pursuant to <u>Anders v. California</u>, 386 U.S. 738 (1967), asserting that there were no meritorious arguments to support the contention that reversible error occurred in the trial court (Ex. J). Petitioner filed a pro se initial brief (*see* doc. 16, Ex. A). *See* Case Docket, <u>Bailey v. State</u>, No. 1D06-1364, 952 So. 2d 1194 (Fla. 1st DCA 2007) (Table) (link to docket). The First DCA affirmed the judgment per curiam without written opinion on March 19, 2007, with the mandate issuing April 16, 2007 (Exs. K, L). *Id.* Petitioner did not seek further review.

On December 3, 2007, Petitioner filed a pro se motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. M at 1–28). On July 11, 2008, the state circuit court summarily denied the motion (Ex. N). Petitioner appealed the decision to the First DCA, Case No. 1D08-4574 (Ex. O). The First DCA affirmed the decision per curiam without written opinion on March 10, 2009, with the mandate issuing April 7, 2009 (Exs. P, Q). <u>Bailey v. State</u>, 4 So. 3d 1222 (Fla. 1st DCA 2009) (Table).

Petitioner filed the instant federal habeas action on June 25, 2009 (doc. 1). Respondent concedes the petition is timely (doc. 9 at 12).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[3] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  <u>Lockyer</u>, 538 U.S. at 73 (quoting <u>Williams</u>, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting <u>Williams</u>, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  <u>Williams</u>, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  <u>Holland v. Jackson</u>, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683

(2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, — F.3d —, 2011 WL 609844, at *13 (11th Cir. Feb. 23, 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87 (Jan. 19, 2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, supra at *17 (citing Harrington, 131 S. Ct. at 786).   Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra*, at *18 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").  The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 2010 WL 609844, at * 18.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

A.    Ground One:  "Ineffective assistance of counsel for failing to preserve issue for appellant [sic] review."

Petitioner states during his trial, a knife used during commission of the aggravated battery was admitted into evidence (doc. 1 at 4).  Petitioner states that on the night of the battery, the victim

told law enforcement that he did not see Petitioner with the knife (*id.*).  Petitioner contends counsel was ineffective for failing to object to admission of the knife on the ground that its probative value was outweighed by its prejudicial effect (*id.*).

Respondent states Petitioner appears to have exhausted this claim by presenting it in his Rule 3.850 motion and appealing the state circuit court's denial of the motion (doc. 9 at 21).  Respondent contends Petitioner failed to show the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law (*id.* at 21–22).

1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293

(citing <u>Strickland</u>, 466 U.S. at 690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").   "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317).   Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high.  *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal.  *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

2.      Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Ground Two in his Rule 3.850 motion (Ex. M at 3–4).  He argued there was no evidence that the knife was in his possession on the night of the aggravated battery; therefore, defense counsel should have objected to its admission (*id.*).

In the written order denying Petitioner's post-conviction motion, the state circuit court correctly identified the Strickland standard as the controlling legal standard (Ex. N at 170).  The court determined that there was sufficient evidence introduced at trial to demonstrate that Petitioner used the knife during commission of the aggravated battery (*id.*).  Therefore, counsel was not ineffective for failing to object to its admission (*id.*).

Petitioner appealed the state circuit court's decision to the First DCA.  The appellate court affirmed per curiam without written opinion.  As previously discussed, when faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, 633 F.3d at 1287 (citing Harrington, 131 S. Ct. at 786).  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Harrington, 131 S. Ct. at 786; *see also* Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

According to the trial transcript, Mr. Cecil Golden, the victim of the aggravated battery, testified that on July 4, at approximately 3:30 a.m., he awoke to Petitioner sticking him in the throat with a knife (Ex. E at 59–73).  Mr. Golden testified Petitioner cut him in the throat and then cut him from the edge of his eye down his face (*id.*).  He testified that the two of them struggled until he (Golden) was able to pin Petitioner to the floor, and a deputy arrived at the scene and subdued Petitioner with a stun gun (*id.*).  Mr. Golden testified he received twelve stitches for his wounds (*id.*).  Mr. Golden's "common law wife," Elsie Holcomb, testified she did not know that Petitioner

had a knife when he was hitting Mr. Golden, but after the scuffle, she found a handle of one of her steak knives in the bedroom and placed in on a dresser (*id.* at 45–46).

Deputy Jarred Nichols responded to Elsie Holcomb's 911 call (Ex. E at 93–113). He entered the bedroom and saw Mr. Golden and Petitioner on the floor on the side of the bed (*id.*). Deputy Nichols testified Mr. Golden was bleeding from his face and neck (*id.*). He testified he recovered the blade of a steak knife from beside the bed, where Mr. Golden and Petitioner were struggling, and he located the handle of the knife on the dresser (*id.*). Deputy Nichols testified he collected the knife blade and handle as evidence, along with several other items (*id.*). Nichols testified as to the chain of custody of the items collected from the crime scene (*id.* at 101–03). Deputy Nichols identified the knife blade and handle that he collected from the scene, and they were admitted into evidence at Exhibit 36 (*id.* at 105–06). On cross-examination, defense counsel asked Deputy Nichols whether Mr. Golden told him that he (Golden) "jobbed" Petitioner with the knife, and Nichols stated he did not recall that statement (*id.* at 162). Defense counsel impeached Deputy Nichols's testimony with a transcript of his interview of Mr. Golden at the scene, which included Mr. Golden's statement that he "jobbed him [Petitioner] in there with that damn knife" (*id.* at 162–63; *see also* Ex. M at 168). On re-direct, Deputy Nichols testified he asked Mr. Golden if he ever saw Petitioner with a knife, and Golden responded "No"; but when Nichols then asked Mr. Golden if he felt something sharp striking him across the nose, Mr. Golden responded affirmatively (Ex. E at 166; *see also* Ex. M at 168).

In Petitioner's recorded statement to Deputy Nichols, which was published to the jury, Petitioner admitted he swung a knife at Mr. Golden in an attempt to get out of the house (Ex. E at 139–41).

The second element of aggravated battery is that the defendant intentionally or knowingly caused great bodily harm, permanent disability, or permanent disfigurement to the victim or used a deadly weapon in committing the battery. *See* Fla. Stat. § 784.045. Evidence that Petitioner used a knife when he struck Mr. Golden was relevant to this element. The testimony of Ms. Holcomb, Mr. Golden, and Deputy Nichols linked the knife to Petitioner as the weapon he used during the battery upon Mr. Golden, and their testimony provided a predicate and foundation for admission of the knife into evidence. The fact that the knife was prejudicial did not provide a basis for objecting

to its admission.  Rule 90.403 of the Florida Rules of Evidence provides that logically relevant evidence may be excluded when its probative weight is substantially outweighed by the danger of unfair prejudice.  Fla. R. Evid. 90.403.  However, Rule 90.403 does not bar evidence that is simply prejudicial or damaging to the defense.  *See* Amoros v. State, 531 So. 2d 1256, 1260 (Fla. 1988). "Only where the unfair prejudice substantially outweighs the probative value of the evidence should it be excluded."  *Id.* (citation omitted).  Florida courts have described "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Wright v. State, 19 So. 3d 277, 296 (Fla. 2009) (citations omitted).  The rule of exclusion "is directed at evidence which inflames the jury or appeals improperly to the jury's emotions."  *Id.* (citations omitted); *see also* Wuornos v. State, 644 So. 2d 1000, 1007 (Fla. 1994) ("All evidence of a crime, including that regarding the murder in question, 'prejudices' the defense case.  The real question is whether that prejudice is so unfair that it should be deemed unlawful."). Although Petitioner argues admission of the knife "inflamed the jury" and "inflamed the court during sentencing" (doc. 16 at 4), the record does not show that the appearance of the knife was such that it tended to inflame the emotions of the jury, or that the State or the court drew unusual attention to the knife or placed unusual importance on it.  Petitioner thus failed to show that admission of the knife was unduly prejudicial.  *See* Bega v. State, 100 So. 2d 455, 457–58 (Fla. 2d DCA 1958) (in second degree murder prosecution, evidence sufficiently linked defendant with knife as to permit the knife to be introduced in evidence; further, record disclosed no such unusual appearance of knife as would make its admission unfairly prejudicial to defendant).

Petitioner failed to show that defense counsel's failure to object to admission of the knife was unreasonable, or that there was a reasonable probability an objection by counsel would have been properly sustained by the trial court.  Therefore, the state court's denial of Petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of Strickland.

    B.    Ground Two:  "Ineffective assistance of counsel for failing to call expert witness for suppression hearing."

Petitioner states he strongly urged defense counsel to call Dr. Clinton E. Rhyne, a clinical psychologist, as an expert witness at the suppression hearing to testify as to the voluntariness of Petitioner's confession (doc. 1 at 4; doc. 16 at 4–5).  Petitioner states Dr. Rhyne would have testified

as to his diminished mental capacity, mental history, and current mental problems (doc. 16 at 4–5). He states according to Dr. Rhyne's report, which Petitioner attached to his Rule 3.850 motion, Petitioner suffered an alcohol/drug-induced blackout the same morning Petitioner gave his confession (*id.* at 5, see Ex. M at 19–24). Petitioner states Dr. Rhyne diagnosed him with "Alcohol Dependence, In Controlled Environment R/O Polysubstance Dependence," and "Personality disorder NOS (Prominent Antisocial Features)" (*id.*). Petitioner argues the trial court would have suppressed his confession based upon Dr. Rhyne's testimony (doc. 16 at 5).

Respondent states it appears Petitioner exhausted his claim by presenting it in his Rule 3.850 motion and appealing the state circuit court's summary denial (doc. 9 at 22). Respondent contends Dr. Rhyne's report finds only a suggestion that Petitioner may have suffered from a drug-induced blackout (*id.*). Further, Dr. Rhyne related the blackout to the time of the offense, not the time of Petitioner's statement to police (*id.*). Respondent argues Dr. Rhyne found Petitioner not to be suffering from any major mental illness and not to meet the criteria for insanity (*id.*). Additionally, Dr. Rhyne's report did not express an opinion as to whether Petitioner's statement, given hours after the incident, was voluntary or not (*id.*). Respondent thus contends Petitioner offered nothing more than speculation that Dr. Rhyne would have provided helpful evidence at the suppression hearing (*id.*). Respondent additionally argues Petitioner failed to show prejudice, because the judge at the suppression hearing was aware that Petitioner had been drinking heavily the night of the incident, knew Petitioner had shown signs of being under the influence to the point of being out of control at the scene, and could tell from police testimony and from the recorded statement that Petitioner gave coherent answers to questions posed during the interview (*id.* at 23). Respondent thus contends Petitioner failed to show the state court's adjudication of the claim was contrary to or an unreasonable application of <u>Strickland</u> (*id.* at 22–23).

   1.  Clearly Established Federal Law

The clearly established federal standard for evaluating claims of ineffective assistance of counsel is the <u>Strickland</u> standard set forth *supra*.

   2.  Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Ground Three in his Rule 3.850 motion (Ex. M at 4–5).  The state circuit court determined that the trial court was capable of making a determination as to whether or not Petitioner's statement to law enforcement was freely and voluntarily given based upon the evidence presented, without the need for expert testimony (Ex. N at 170).[4]  The court found, "this Court made the determination that the Defendant's statement was voluntary when it heard Defendant's own voice on the recorded statement along with the other testimony presented" (*id.*).  The court concluded that defense counsel was not ineffective for failing to call Dr. Rhyne as a witness (*id.* at 171).

Dr. Rhyne evaluated Petitioner on September 19, 2005, approximately ten weeks after the date of the offenses (Ex. M at 19).  As part of his evaluation, he interviewed Petitioner, his wife, and jail personnel (*id.*).  He also reviewed Deputy Nichols's report, which included a description of Petitioner's interview with law enforcement after he was arrested (*id.* at 19–20).  Dr. Rhyne's preliminary diagnostic impression included a diagnosis of alcohol dependence and personality disorder with prominent antisocial features (*id.* at 23).  Dr. Rhyne opined Petitioner was competent to proceed in the criminal matter, and competent to enter into a plea bargain arrangement should he choose to do so (*id.*).  With regard to Petitioner's mental status at the time of the offense, he provided the following opinion:

> The information disclosed over the course of this evaluation contains little suggestion of the presence of a major mental disorder at the time of the instant offense that would have caused Mr. Bailey to have met the criteria for insanity.  His statements to the police and the information provided by his wife indicate that Mr. Bailey had consumed a large quantity of alcohol over the course of the evening prior to his assault on the victim and that he may have also used Methamphetamines and Cannabis.  Mr. Bailey's total absence of memory, in conjunction with the observations of his wife and the victims, suggest that he was suffering an alcohol/drug induced blackout at the time of the instant offense.  His actions were therefore the likely product of the features of his personality disorder and an acute state of intoxication.  It is noted in this regard that the state of diminished capacity produced during blackouts may likely result in an inability to form specific intent.

(*id.* at 24).

---

[4] The same judge presided over the trial proceedings and post-conviction proceedings.

Defense counsel filed a motion to suppress Petitioner's post-arrest statement to deputies at the jail, on the ground that his statement was not freely and voluntarily given due to his being under the influence of alcohol or drugs or both, and the short period of time between his offense conduct and his statement to law enforcement (Ex. B at 14–127).  In support of the motion, defense counsel submitted the following:  (1) the transcript of Elsie Holbomb's 911 call, (2) transcripts of Deputy Nichols's interviews with Cecil Golden, Elsie Holcomb, and Eleanore Voigt (Ms. Holcomb's sister), (3) transcripts of depositions of Cecil Golden, Elsie Holcomb, Eleanore Voigt, and Deputy Nichols, (4) Deputy Nichols's incident report, and (5) the transcript of Petitioner's statement to law enforcement (*id.*).

The transcript of the 911 call indicated the call to dispatch was made at 4:45 a.m. (Ex. B, 19–23).  At Petitioner's trial, the dispatcher testified the 911 system operated on Eastern Standard Time, so the time indicated in the call and on the transcript was one hour later than the actual events and "the minutes are off a little" (Ex. E at 23).  During the call, Elsie Holcomb stated, "He [Petitioner] looks like he's all doped up" (Ex. B at 21).  During Deputy Nichols's  interview with Mr. Golden at the scene, Mr. Golden stated Petitioner was "all doped up and drunk" and vomited on the bed, but Mr. Golden did not smell alcohol on Petitioner (*id.* at 25).  Ms. Voigt told Deputy Nichols that Petitioner acted like he was under the influence of drugs but not alcohol, and the things Petitioner said during the incident did not make sense (*id.* at 34).  During Mr. Golden's deposition, he stated a gray-colored substance came out of both sides of Petitioner's mouth shortly before Deputy Nichols arrived, and then Petitioner "come to hisself [sic] . . . and he said, what was he doing there" (*id.* at 42).  During Ms. Holcomb's deposition, she stated Petitioner vomited on the floor, did not know where he was or what was going on, and told her he had beaten his girl and his baby to death before he came (*id.* at 56–57).  During Ms. Voigt's deposition, she stated Petitioner was "all drugged up" and did not know where he was (*id.* at 66).  The transcript of Petitioner's statement to law enforcement indicated the statement was made at 6:20–6:55 a.m. on July 4, 2005 (*id.* at 93–119).

At the suppression hearing, Deputy Nichols testified he was dispatched to the scene at 3:37 a.m. on July 4, and arrived there at 3:51 (Ex. C at 7).  He testified that when he arrived, Petitioner and Mr. Golden were struggling (*id.* at 5).  He testified Petitioner did not follow his instructions and "was just too hyped up" (*id.* at 6).  He stated he used his taser and was then able to secure Petitioner

(*id.*).  Deputy Nichols testified Petitioner did not make sense and "wasn't very clear about anything" at the scene (*id.* at 6–7).  He testified that after he handcuffed Petitioner, he placed him in his patrol car and then finished his investigation (*id.* at 6).  Nichols testified that after he completed his investigation, he transported Petitioner to the Sheriff's Office, which took approximately 20–25 minutes, and they arrived at the Sheriff's Office shortly before 6:00 a.m. (*id.* at 6, 8).  Deputy Nichols identified the <u>Miranda</u> rights form signed by Petitioner at the beginning of his interview, and the form was admitted into evidence (*id.* at 8–9; Ex. B at 156).  According to the transcript of the interview, it began at 6:20 a.m. and concluded at 6:55 a.m. (Ex. B at 93, 119).  At the beginning of the interview, Deputy Nichols read Petitioner his rights as they appeared on the form (Ex. C at 9, Ex. B at 94, 156).  Deputy Nichols testified that Petitioner read the form as Nichols read it aloud (Ex. C at 9).  Nichols testified that it never appeared Petitioner did not understand what he (Nichols) was saying or what Petitioner was reading (*id.*).  Nichols testified that when Petitioner signed the form, he signed it on the appropriate line and did not appear to have trouble signing it or maintaining control of the pen (*id.* at 10).  Nichols testified Petitioner provided accurate background information, including his address and social security number (*id.* at 9).  Deputy Nichols testified he "definitely" noticed that Petitioner's demeanor was different during the interview than at the scene (*id.* at 12, 18).  He testified that at the scene, Petitioner was "really hyped up, not in control of himself," but at the Sheriff's Office, he was "a lot more calm" (*id.*).  Nichols testified Petitioner was very direct with his answers, his answers were "on subject," and he did not "wonder off" at all (*id.* at 9, 13).  On cross-examination, Nichols testified Petitioner smelled of alcohol at the scene and appeared to be under the influence of alcohol (*id.* at 23).

Deputy Mallory also testified at the suppression hearing (Ex. C at 24–26).  He testified he arrived at the scene shortly after Petitioner was secured in the patrol car and was present during the interview at the Sheriff's Office (*id.* at 25; Ex. B at 93).  Mallory estimated that "a couple of hours" elapsed between the time they were at the scene and the time of the interview (Ex. C at 26).  He testified Petitioner "seemed different" at the Sheriff's Office than at the scene (*id.* at 26).  He stated, "He seemed like he was fine and his mental faculties were fine" (*id.*).  He testified Petitioner was calm and cooperative during the interview (*id.* at 25).  He testified Petitioner appeared able to think

and be truthful during the interview, and he appeared to understand the questions being asked of him (*id.* at 26–27).

The audio recording of the interview was played during the suppression hearing (*see* Ex. C at 19–20). Additionally, the court reviewed the transcript of the interview (*see id.* at 20).

At the conclusion of the hearing, the court noted the issue was whether Petitioner was so intoxicated at the time he gave his statement that his consent to give it was involuntary (Ex. C at 29). The court opined:

> It's clear to me from listening to the tape and reading the transcript, he is oriented as to place and time. He understands the questions, he gives responsive answers to those questions, whether those answers are accurate or not, whether his memory is accurate or not, is not the issue. It's clear to me, both from the officer's testimony and upon hearing and listening to Mr. Bailey's responses to their questions, that he was certainly capable of and had given voluntary consent . . . .

(*id.* at 29–30).

It appears that the most favorable testimony Dr. Rhyne may have provided at the suppression hearing was his opinion that Petitioner may have suffered an alcohol/drug-induced blackout at the time of the offense, and that such blackouts produce a state of diminished mental capacity. However, Petitioner's suggestion that Dr. Rhyne would have testified that Petitioner's mental capacity was diminished at the time of the interview is based purely on speculation. Further, Deputy Nichols and Deputy Mallory testified that Petitioner's demeanor was very different at the scene than during his interview at the Sheriff's Office approximately two hours later. Most importantly, the trial court listened to Petitioner's voice on the audio recording of the full interview at the Sheriff's Office and read the transcript of the interview. The court found as fact that during the interview, Petitioner was oriented to place and time, and his answers were responsive to the questions he was asked. Based upon this record, it was not unreasonable for the state post-conviction court to conclude that the outcome of the suppression hearing would not have been different if counsel had presented Dr. Rhyne's testimony. Therefore, Petitioner failed to demonstrate that the state court's adjudication of his claim was contrary to or an unreasonable application of Strickland.

      C.      Ground Three: "Trial court erred denying [sic] motion to suppress confession."

Petitioner argues the trial court erroneously denied his motion to suppress (doc. 1 at 5). He argues the evidence showed he was disorientated to place and time, unable to fully understand questions presented to him, and unable to give correct, cohesive, and responsive answers (*id.*). He additionally argues his confession was obtained prior to his signing the waiver form, which violated Miranda v. Arizona, 384 U.S. 436 (1966) (*id.*).

Respondent contends Petitioner never presented this claim to the state courts; therefore, it is unexhausted (doc. 9 at 5). Respondent further contends notwithstanding the failure to exhaust, the claim is without merit, because sufficient evidence was adduced at the suppression hearing to support the trial court's denial of the motion to suppress (*id.*).

   1. Clearly Established Federal Law

The Supreme Court has held that a defendant's statement to authorities is voluntary if it is "the product of a rational intellect and a free will." Mincey v. Arizona, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (quoting Blackburn v. Alabama, 361 U.S. 199, 208, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960)). To determine whether a confession has been made "freely, voluntarily, and without compulsion or inducement of any sort," the court must examine the totality of the circumstances surrounding the confession. Withrow v. Williams, 507 U.S. 680, 688–89, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993) (internal quotation and citations omitted). This determination requires an inquiry, first, into whether the law enforcement officers informed the accused of his various constitutional rights as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed. 2d 694 (1966), and if so, second, into whether, considering all of the surrounding circumstances, the statement was the product of the accused's free and rational choice. Paxton v. Jarvis, 735 F.2d 1306, 1308 (11th Cir. 1984).

The Section 2254 presumption of correctness discussed *supra* applies to subsidiary findings underlying the state court's resolution of the question of voluntariness. Miller v. Fenton, 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985). Such findings may involve the circumstances of the accused's interrogation and custody, his mental condition, and the actions of the law enforcement officers. McCoy v. Newsome, 953 F.2d 1252, 1263 (11th Cir. 1992). If the state court failed to make explicit findings of fact, its denial of the motion to suppress "resolves all conflicts in testimony bearing on that claim against the criminal defendant." Waldrop v. Jones, 77 F.3d 1308,

1316 (11th Cir. 1996) (quoting Culombe v. Connecticut, 367 U.S. 568, 604–05, 81 S. Ct. 1860, 1880, 6 L. Ed. 2d 1037 (1961)).  The federal habeas court presumes the correctness of credibility determinations made at the trial court level.  *See* Marshall v. Lonberger, 459 U.S. 422, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983).

      2.      Federal Review of State Court Decision

      Petitioner raised both aspects of his claim in his pro se initial brief on direct appeal of his conviction (doc. 16, Ex. A).  However, only the first aspect of his claim, that is, that Petitioner's statement was not freely and voluntarily given due to his being under the influence of alcohol or drugs or both and the short period of time between his offense conduct and his statement to law enforcement, was preserved below in the motion to suppress (*see* Ex. B at 14–127).  The First DCA affirmed Petitioner's conviction without written opinion (Ex. K).

      According to Deputy Nichols's testimony at the suppression hearing, Petitioner was advised of his rights at the very beginning of the interview (Ex. C at 9–10).  This is corroborated by the transcript of the interview (Ex. B at 93–94).  The transcript also shows that Petitioner signed the waiver form at the beginning of the interview (*id.*).  Although the form itself bears a time of "0655" (Ex. B at 156), which is the time the interview concluded (*see* Ex. B at 119), that time appears below the signatures of the two witnesses from the Calhoun County Sheriff's Department, not Petitioner's signature. Based upon this record, the state court reasonably could have concluded that Petitioner was given a Miranda warning at the jail before questioning began, and he executed a formal waiver. Additionally, although the evidence suggested Petitioner was intoxicated at the scene, the evidence also showed that over two hours elapsed between Deputy Nichols's arrival at the scene at 3:50 a.m. and the beginning of the interview at the jail at 6:20 a.m.  The trial court found as fact that during the interview, Petitioner was oriented as to place and time, he understood the questions he was asked, and he gave answers responsive to those questions.   Based upon the totality of the circumstances, Petitioner failed to show that the state court's denial of his constitutional claim was contrary to or an unreasonable application of clearly established federal law.  *See* Hubbard v. Haley, 317 F.3d 1245, 1253–54 (11th Cir. 2003) (district court did not clearly err in concluding evidence was insufficient to show that Hubbard was either too drunk or too sick from alcohol withdrawal to voluntarily make statement to police; multiple witnesses testified that while Hubbard did have an

odor of alcohol about him, he did not appear to be intoxicated or suffering from delirium tremens at the time he spoke to officers at police station; acknowledging, albeit tacitly, that the record before the trial judge when he denied Hubbard's motion to suppress contained no evidence that he was in "a biologically coercive state," Hubbard relied on affidavits of two doctors to support his claim, however, affidavits, made years after Hubbard made his statement, were nothing but mere speculation and thus possessed no probative value); *see also, e.g.,* United States v. Figueroa, 419 Fed. Appx. 973, 978, 2011 WL 1168821, at *4 (11th Cir. 2011) (unpublished) (district court did not clearly err in finding that defendant's consent to the search of his apartment by Drug Enforcement Administration (DEA) agents was voluntary; although defendant testified he had used heroin the night before the search, and was still high on heroin when he consented to the search, two agents testified that when defendant gave his consent to search, he was coherent and appeared to understand what was happening, and one of the agents also testified that no coercion was involved in obtaining defendant's consent, that defendant was aware of his rights, and that, after giving consent, defendant denied that any incriminating evidence would be found in his apartment); United States v. Smith, 322 Fed. Appx. 876, 878–79, 2009 WL 961603, at *1 (11th Cir. 2009) (unpublished) (affirming trial court's denial of Smith's motion to suppress statements to law enforcement where Smith was given Miranda warnings upon his arrest and again at the jail before questioning began; while Smith did not execute a formal waiver, he voluntarily spoke to officers and made consistent statements, both at the scene and at the jail; although Smith had been intoxicated, at least three hours elapsed between the car accident and the start of the jail interview; and at the interview, Smith noted that officers had already read his rights to him, appropriately responded to questions, and even acknowledged that he was sober during the questioning; based on the totality of these circumstances, the district court made no error in determining that the passage of time and Smith's demeanor during questioning rendered his waiver of Miranda rights knowing and voluntary).[5]

   D.    Ground Four:  "Ineffective assistance of counsel for failing to investigate and bring to Petitioner's attention an insanity defense."

   Petitioner contends defense counsel was ineffective for failing to investigate and bring to his attention an insanity defense "superinduced" by long term use of intoxicants (doc. 1 at 5).

---

[5] The undersigned cites Figueroa and Smith only as persuasive authority and recognizes that the opinions are not considered binding precedent.  *See* 11th Cir. R. 36-2.

Respondent contends Petitioner failed to show he is entitled to relief on this claim (doc. 9 at 24–25). In Petitioner's reply, he concedes he is not entitled to relief on this claim (doc. 16 at 7).  The court accepts Petitioner's concession and will not conduct further review.

IV.     CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Kenneth S. Tucker is substituted for Walter A. McNeil as Respondent.


And it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 12ᵗʰ day of October 2011.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**